UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MEDLINE INDUSTRIES, INC., | ) | |
| | ) | No. 14 CV 3618 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| C.R. BARD, INC., | ) | |
| | ) | January 26, 2015 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Before the court is Defendant C.R. Bard, Inc.'s ("Bard") motion to compel production of documents that Plaintiff Medline Industries, Inc. ("Medline") has withheld on the basis of privilege. Specifically, Bard seeks production of: (1) drafts of declarations submitted to the United States Patent and Trademark Office ("USPTO") signed by Jennifer Tomes, a former Medline employee and a named inventor for the disputed patents; (2) drafts of a declaration signed by Richard Lyon, a non-employee fact witness for Medline; and (3) an unredacted copy of an agreement between Tomes and Medline's counsel, Cooley LLP ("Cooley"). For the following reasons, Bard's motion to compel is granted in part and denied in part:

## Background

Medline filed this lawsuit in 2014 alleging that Bard has been infringing on three patents relating to a urinary catheter tray Medline developed in 2009. (See R. 37, Second Am. Compl. ¶¶ 1, 15.) Bard then brought a counterclaim against Medline, asserting that two of the disputed patents are unenforceable based on

what it alleges to be Medline's inequitable conduct during the prosecution of those patents. (R. 163, Am. Answer at 15, 37.) Bard bases its counterclaim in part on allegations that Tomes, Medline's former marketing director and the first-named inventor on the patents, filed declarations with the USPTO purporting to provide objective evidence from publications praising Medline's embodiment of the asserted patents. (See R. 152-1, Def.'s Mot. at 3.) Lyon, a fact witness not employed by Medline, also signed and filed a declaration with the USPTO in support of the invention's non-obviousness. (Id.) Bard asserts that the publications cited in both the Tomes and Lyon declarations were merely "Medline press releases in disguise." (Id. at 1.) When Bard sought to discover drafts of the Tomes and Lyon declarations to support its counterclaim, Medline withheld them on the basis of attorney-client privilege. Bard now seeks to compel Medline to produce these drafts.

Bard also seeks an unredacted copy of an agreement between Tomes and Cooley relating to her role as a consultant and fact witness in this litigation ("Tomes Agreement"). (Id. at 4.) According to Bard, it first became aware that Tomes had been retained by Medline as a consultant in this matter when she submitted a declaration in support of Medline's motion to dismiss Bard's counterclaim. (See id.) When Bard requested that Medline produce a copy of the Tomes Agreement, Medline produced a heavily redacted version of the agreement citing the attorney-client privilege and work-product protection. (R. 152-1, Def.'s Mot. at 4; R. 190, Pl.'s Opp. at 2.)

## Analysis

Bard argues that the draft declarations are not privileged because they are factual and do not involve legal advice. (R. 152-1, Def.'s Mot. at 4.) Medline argues in response that federal courts routinely hold that communications with counsel in the course of prosecuting patent applications, including draft declarations, are privileged. (R. 190, Pl.'s Opp. at 3.) Bard asserts in its reply that according to Medline's privilege log, the declarations are not communications with counsel and convey "what can only be public information" regarding the invention's non-obviousness. (See R. 167, Def.'s Reply at 1.) Bard further contends that Lyon's draft declarations are not privileged because Lyon and Medline's counsel did not have an attorney-client relationship.[1] (Id. at 1.)

As for the Tomes Agreement, Bard contends that communications between Cooley and its client's former employee are not privileged and that Cooley's "purported representation" of Tomes in her personal capacity is "form over substance." (R. 152, Def.'s Mot. at 4-5.) Moreover, according to Bard, the timing of the Tomes Agreement creates an "appearance of impropriety" which justifies its discovery. (R. 167, Def.'s Reply at 2.) Medline counters that Bard mischaracterizes

---

[1] Bard also raises for the first time in its reply an undeveloped argument that Medline waived privilege over the draft Tomes declarations by putting them at issue. (R. 167, Def.'s Reply at 1.) But as Medline correctly points out in its sur-reply, Bard forfeited its waiver argument by failing to raise it in the original motion and by failing to provide sufficient factual or legal support. (See R. 177, Pl.'s Sur-Reply at 2-3); *see also Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013) (arguments raised for the first time in a reply brief are waived); *Schomas v. Colvin*, 732 F.3d 702, 703 (7th Cir. 2013) (undeveloped or unsupported contentions are waived). Accordingly, the court will not address the merits of Bard's waiver argument.

the Tomes Agreement as a "consulting agreement" when it is in fact an engagement letter, which places it squarely within the protection of the attorney-client privilege. (See R. 190, Pl.'s Opp. at 2-3.)

**A.     Choice of Law**

The court must first determine whether to apply Federal Circuit law or Seventh Circuit law. *See Meds. Co. v. Mylan Inc.*, 936 F. Supp. 2d 894, 899 (N.D. Ill. 2013). Because this case involves claims under federal patent laws, federal common law regarding privilege governs. *See* Fed. R. Evid. 501; *United States v. Zolin*, 491 U.S. 554, 562 (1989) ("Questions of privilege that arise in the course of the adjudication of federal rights are governed by the principles of the common law . . . ." (internal quotations omitted)). Moreover, regional circuit law governs non-patent issues while Federal Circuit law governs issues of substantive patent law. *Mylan*, 936 F. Supp. 2d at 899 (citing *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803 (Fed. Cir. 2000)). Federal Circuit law may also govern any substantive or procedural issues "intimately involved in the substance of enforcement of the patent right." *Id.* (citing *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001)). But regional circuit law applies to procedural questions not themselves issues of substantive patent law unless they: (1) pertain to patent law; (2) bear an essential relationship to matters committed by statute to the exclusive control of the Federal Circuit; or (3) clearly implicate the responsibilities of the Federal Circuit in a field within its exclusive jurisdiction. *See GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1272 (Fed. Cir. 2001).

The present discovery dispute is governed in part by Seventh Circuit law and in part by Federal Circuit law. Bard's claim of inequitable conduct—which underlies this discovery dispute—implicates substantive patent law. *See In re Spalding*, 203 F.3d at 803-04 (recognizing inequitable conduct as an issue of substantive patent law). The discoverability of evidence such as draft declarations required to establish inequitable conduct also implicates substantive patent law. *See In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1298 (Fed. Cir. 2006) ("Federal Circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, if those materials relate to an issue of substantive patent law."). Therefore, because the procedural issue of whether privilege applies to the draft declarations—which Bard asserts it will use to establish a claim of inequitable conduct—necessarily implicates substantive patent law, Federal Circuit law governs that determination. *See Mylan*, 936 F. Supp. 2d at 900 (citing *In re Seagate Tech., LLC*, 497 F.3d 1360, 1367-68 (Fed. Cir. 2007)). However, to the extent relevant Federal Circuit case law is unavailable, the court will look to regional circuit law and other federal cases for guidance. *See, e.g., Taylor v. United States*, 73 Fed. Cl. 532, 544 (Fed. Cl. 2006) ("Because there is no case law directly on point from the Federal Circuit, this court also looked for guidance from other circuits.").

Whether the Tomes Agreement is protected by attorney-client privilege or the work-product doctrine is a procedural question that does not implicate substantive patent law. Although Bard is "understandably interested" in Tomes' relationship

5

with Medline, (see R. 152-1, Def.'s Mot. at 4), there is no indication that the Tomes Agreement is relevant to establishing any of Bard's claims or defenses. Accordingly, the court will apply Seventh Circuit law in deciding whether attorney-client privilege or work-product doctrine protects the Tomes Agreement from disclosure. *See McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 251 (N.D. Ill. 2000); *see also Smithkline Beecham Corp. v. Pentech Pharms., Inc.*, No. 00 CV 2855, 2001 WL 1397876, at *1 (N.D. Ill. Nov. 5, 2001) (applying Seventh Circuit law because discovery dispute "involve[d] general issues of privilege").

**B.    Drafts of Tomes Declarations**

Having determined the applicable laws governing this discovery dispute, the court turns to the issue of whether the draft Tomes declarations are privileged. "[P]rivilege protects a client's confidential communications to an attorney necessary to obtain legal counseling." *See Shearing v. Iolab Corp.*, 975 F.2d 1541, 1546 (Fed. Cir. 1992) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)). The privilege "exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). In the patent context, the mere fact that a document contains technical information rather than explicit legal advice is not dispositive of the privilege issue because requesting or providing legal advice in preparing a patent application necessarily requires evaluating technical information. *See Mylan*, 936 F. Supp. 2d at 901. In fact, the Federal Circuit has held that privilege applies if "the overall tenor of the document

6

indicates that it is a request for legal advice or services." *In re Spalding*, 203 F.3d at 805-06. In *Spalding,* the Federal Circuit found that "invention records"—documents including information such as the names of inventors, descriptions of the invention, closest prior art, and dates of publication—constitute privileged communications as long as they are provided to an attorney for purposes of securing legal services or assisting in a legal proceeding. *Id.* at 802-803. The court, quoting *Knogo Corporation v. United States*, 213 U.S.P.Q. (BNA) 936 (Ct. Cl. Trial Div. Feb. 16, 1980), explained that:

> [t]he fact that much of the technical information in one form or another finds its way into the patent application, to be made public when the patent issues, should not preclude the assertion of the privilege over the communication in which that information was disclosed to the attorney. If an attorney-client communication could be discovered if it contained information known to others, then it would be the rare communication that would be protected and, in turn, it would be the rare client who would freely communicate to an attorney.

*In re Spalding*, 203 F.3d at 806 (quotations omitted).

Courts in this district have adopted the reasoning in *Spalding*, finding documents privileged which "appear to reveal communications involved in the strategizing process proceeding patent application." *See Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 537 (N.D. Ill. 2000). In *McCook Metals*, the court found "drafts of the specifications, claims, and other parts of the patent application prepared by the attorney" to be privileged because they "necessarily reflect[] the communications between a client and his attorney as the attorney attempts to put forth the invention in the best light possible to protect a client's legal right." 192 F.R.D. at 252-53. Acknowledging that other courts have found that such documents

are not privileged because the information therein is eventually made public, the court in *McCook Metals* respectfully disagreed with those courts because "they fail[ed] to recognize the legal importance that a first-rate patent attorney adds to [] legal protection . . . by the proper legal draftsmanship of an airtight patent that is successfully and properly prosecuted." *Id.* at 253 (internal citations omitted).

Courts in other jurisdictions have also adopted the reasoning in *Spalding*. For example, in *Baxter Healthcare Corporation v. Fresenius Medical Care Holding, Inc.*, No. C 07-1359, 2009 WL 533124, at *2 (N.D. Cal. Mar. 3, 2009), the court quoted *McCook Metals* in finding that draft patent applications were privileged. In another case, *In re Rivastigmine Patent Litigation (MDL No. 1661)*, 237 F.R.D. 69, 85-86 (S.D.N.Y. 2006), the court rejected the defendants' argument that a draft is not a communication and therefore, not privileged. It acknowledged that after an attorney receives information from a client and shapes it for inclusion in the attorney's draft patent application, the information loses its character as a communication from the client. *Id.* at 86 (citations omitted). But in finding nonetheless that draft patent applications and supporting client affidavits were privileged, the *Rivastigmine* court explained that "it seems an impossible task to determine at what point in the back and forth exchange of ideas the attorney-client privilege dissolves," and that "aborting the communications at an arbitrary point would undermine" the purpose of privilege. *Id.*

With this legal landscape in mind, the court must determine whether drafts of the Tomes declarations fall within the ambit of the attorney-client privilege.

8

Bard does not appear to dispute that Tomes and Attorney Phillip Burrus, Medline's outside patent counsel, had an attorney-client relationship at the time the declarations were drafted. Rather, Bard argues that inventor declarations are factual and do not involve legal advice. (R. 152-1, Def.'s Mot. at 4.) It further argues that because the declarations were prepared to support a patent application before the USPTO, they were not intended to be confidential. (Id.) But *Spalding* and its progeny rebut both of these contentions, and the cases Bard cites in support of its arguments pre-date *Spalding*. (See id.) As discussed above, privilege analysis in the context of patent suits no longer turns on whether a document is technical in nature or whether it was submitted, in its final form, to the USPTO. *See, e.g., Mylan*, 936 F. Supp. 2d at 901; *McCook Metals*, 192 F.R.D. at 253. Rather, privilege depends on whether "the overall tenor of the document indicates that it is a request for legal advice or services." *See In re Spalding*, 203 F.3d at 805-06.

Based on the descriptions in Medline's privilege log and this court's *in camera* review, the court finds that drafts of the Tomes declarations are privileged. Medline asserts that Tomes, an inventor of record and a Medline employee at the time the documents were created, worked closely with Burrus to write the drafts for ultimate submission to the USPTO. (See R. 190, Pl.'s Opp. at 3, 8.) And the draft documents appear to reflect "communications involved in the strategizing process" during which the attorney "attempts to shape the [patent] application for presentation to the patent office." *See Apotex Corp.*, 193 F.R.D. at 537. In crafting the final declarations, Burrus and Tomes likely had to make judgment calls, both

9

technical and legal, to persuade the USPTO to issue the patent. *See Advanced Cardiovascular Systems v. C.R. Bard, Inc.*, 144 F.R.D. 372, 376 (N.D. Cal. 1992). They worked together to "creat[e] verbal packages to persuade others, in this case the [US]PTO, to find favorably" for Medline "as opposed to simply dumping upon them a heap of detached, unorganized, technical blizzard of papers[.]" *See McCook Metals*, 192 F.R.D. at 253 (citation omitted). Drafting these "verbal packages" is a process that is "fundamentally dialectical and, in very important respects, legal." *Advanced Cardiovascular*, 144 F.R.D. at 375.

As for confidentiality, even though the final version of the patent application eventually became a matter of public record, the same cannot be said of the "decisions regarding inclusion or exclusion of information" performed by Burrus and Tomes leading up to the application's submission. *See Apotex Corp.*, 193 F.R.D. at 537 (finding that documents prepared in order to allow attorneys to assess patentability and sift information to prepare applications are privileged). In other words, the dynamic between an inventor and patent lawyer supports an expectation from the parties that their communications will remain confidential, despite their technical nature. *See Advanced Cardiovascular*, 144 F.R.D. at 377 ("In this respect, the inventor['s] expectations would seem to parallel the expectations of a prospective litigant who confers at length with counsel prior to the drafting of a complaint . . . .").

Bard further argues that the Tomes drafts are not privileged because they are not communications and because Medline's privilege log only shows that Tomes

sent a draft to Burrus once. (R. 167, Def.'s Reply at 5-6.) But a document need not be a communication itself to be privileged if it "necessarily reflects the communications between a client and his attorney," and federal courts have found that a patent-related draft can "implicitly contain[] the legal opinion and advice of [an] attorney." *See McCook Metals*, 192 F.R.D. at 252-53; *In re Rivastigmine*, 237 F.R.D. at 86 ("The attorney-client privilege therefore generally applies to draft patent applications, amendments, and supporting affidavits, unless the privilege is waived."); *Baxter Healthcare Corp.,* 2009 WL 533124, at *1 (explaining that a document may, "by its nature and contents," reflect legal advice rendered in a privileged conversation and thus be withheld as privileged even though the document itself was not communicated between an attorney and a client) (citation omitted)). Privilege protects not only the giving of professional advice to a client, but also the provision of information to the lawyer to enable him or her to give sound and informed advice. *See Upjohn*, 449 U.S. at 390. And though Bard disputes Medline's assertion that drafting the declaration was "an iterative process," (see R. 167, Def.'s Reply at 6), just because Medline's privilege log only lists one email correspondence from Tomes to Burrus does not mean they did not discuss the drafts using other means. Accordingly, the drafts of the Tomes declaration fall within the scope of the attorney-client privilege.

## C. Drafts of Lyon Declaration

In contrast, the court finds that Medline must disclose the drafts of Lyon's declaration. Bard argues that Lyon, unlike Tomes, was not Medline's employee and

11

did not have an attorney-client relationship with Attorney Burrus. (See R. 167, Def.'s Reply at 3.) In response, Medline makes two arguments to support its assertion of privilege over the Lyon drafts: (1) Lyon had an implied attorney-client relationship with Burrus because Lyon reasonably believed Burrus was acting as his attorney in preparing and submitting his declaration; and (2) drafts of Lyon's declaration were "part of a series of communications" between him and Burrus "for the purpose of assessing patentability," and are therefore privileged. (R. 190, Pl.'s Opp. at 11.) Both of Medline's arguments fall short. First, Medline submits a declaration from Lyon stating that he "understood Mr. Burrus to be acting as [his] attorney" for purposes of preparing his declaration for submission to the USPTO. (R. 190-1, Lyon Decl. ¶ 8.) But to establish an implied attorney-client relationship, a party must show more than just his "mere subjective belief that he [was] represented" to demonstrate such a relationship existed for the purpose of attorney-client privilege. *See United States v. Evans*, 113 F.3d 1457, 1465 (7th Cir. 1997); *see also Black Rush Mining, LLC v. Black Panther Mining*, 840 F. Supp. 2d 1085, 1090-92 (N.D. Ill. 2012) (finding no implied attorney-client relationship despite the potential client's declaration that he believed he was represented); *Cent. Die Casting & Mfg. Co. v. Tokheim Corp.*, No. 93 CV 7692, 1994 WL 233653, at *5 (N.D. Ill. May 25, 1994) (same). More specifically, in the absence of a clear indication by the potential client to the attorney that he believed he was being represented, no attorney-client relationship can be inferred without some finding that the potential

client's subjective belief was "minimally reasonable." *See Evans,* 113 F.3d at 1465 (citing *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985)).

Here, while Lyon may have believed Burrus was his lawyer, his belief was not reasonable. In *United States v. Keplinger*, the Seventh Circuit found no implied attorney-client relationship between corporate counsel and defendant employees where there was little or no evidence that the employees either sought legal advice on an individual basis or manifested in any way their belief that they were being represented individually. 776 F.2d at 701. The court further noted that there was no indication the attorneys told the individual defendants that information disclosed to them would be kept confidential. *Id.* at 701 (citing *In re Grand Jury Proceedings (Jackier)*, 434 F. Supp. 648, 650 (E.D. Mich. 1977) (noting that corporate officer may invoke attorney-client privilege individually only if he "makes it clear when he is consulting the company lawyer that he personally is consulting the lawyer, and the lawyer sees fit to accept and give communication knowing the possible conflicts that could arise")). Not only was Lyon not an employee, Medline has not submitted evidence that Burrus was advising Lyon on an individual basis and keeping information shared between them confidential. In fact, although Lyon states that *he* kept their communications confidential, there is no evidence that Burrus did not share the declaration drafts or discuss their contents with Medline. (See R. 190-1, Lyon Decl. ¶ 8.) In the absence of other clear indicators of an attorney-client relationship, an affidavit from Burrus explaining that he served as Lyon's attorney could have helped Medline meet its burden of proving that the

13

privilege applies here, but Medline did not submit such an affidavit. *See Evans,* 113 F.3d at 1461 (party asserting privilege bears the burden of proving it applies); *see also Knoll Pharms. Co., Inc. v. Teva Pharms. USA, Inc.*, No. 01 CV 1646, 2004 WL 2966964, at *3 (N.D. Ill. Nov. 22, 2004) (finding that an affidavit from the attorney stating that he acted as an attorney to an inventor was sufficient, taken together with other documents, to demonstrate that privilege applied to their communications). Nor does Medline argue that it shared a common legal interest with Lyon such that any communication between Lyon and Medline's attorneys must be considered privileged. *See In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996) (citing *Simpson v. Motorists Mutual Ins. Co.*, 494 F.2d 850, 855 (7th Cir. 1974) ("[W]here the same attorney represents two parties having a common interest, and each party communicates with the attorney, the communications are privileged from disclosure at the instance of a third person.")). Rather, Medline contends that Lyon's belief was reasonable "because an attorney-client relationship arises where a client consults an attorney regarding matters related to patent prosecution." (R. 190, Pl.'s Opp. at 12.) But that argument is circular because it presupposes an attorney-client relationship, and the cases Medline cites in support of that position involved the common interest doctrine or situations where the attorney-client relationship itself was not in question. (See id.) As it stands, Medline has only demonstrated that Lyon was a third-party consultant who did not independently seek legal advice from Burrus, did not pay him for his supposed representation, and did not exercise control over his work. *See Black*

*Rush Mining*, 840 F. Supp. 2d at 1091 (finding insufficient evidence of an implied attorney-client relationship under similar circumstances).

Medline's second argument—that the drafts are privileged because Lyon assisted Burrus in assessing patentability—is also unavailing. Medline relies heavily on *Mylan*, noting that the court in that case found communications between a company's outside patent counsel and a non-inventor scientist privileged because the communications were made for the purpose of determining patentability. (R. 190, Pl.'s Opp. at 13 (citing *Mylan*, 936 F. Supp. 2d at 901).) However, the non-inventor scientist in *Mylan* was an employee of the company that hired the attorney, whereas Lyon was not. *See Mylan*, 936 F. Supp. 2d at 898. Medline attempts to diminish the significance of this distinction, but it is well-settled that privilege often protects communications made in confidence by a company's employees to the company's attorney in large part because of the employees' relationship and responsibilities to their employer. *See Upjohn*, 449 U.S. at 394-99; *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009); *Muro v. Target Corp.*, 243 F.R.D. 301, 305-306 (N.D. Ill. 2007); *see also Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454, 456 (N.D. Ill. 1974) ("It is well settled that the dissemination of a communication between a corporation's lawyer and an employee of that corporation to those employees directly concerned with such matters does not waive the attorney-client privilege."). And since Lyon was not a Medline employee, Medline's argument in favor of privilege essentially rests upon the fact that Lyon assisted Burrus in the prosecution of the patent applications.

(See R. 190, Pl.'s Opp. at 12 (quoting *Mylan*, 936 F. Supp. 2d at 901).) In other words, Medline appears to rely on an exception to the general rule that privilege does not apply to statements made by a client to his attorney in the presence of a third person if that person is assisting the attorney in rendering legal services. *See Jenkins v. Bartlett*, 487 F.3d 482, 490-91 (7th Cir. 2007). Under this exception, privilege extends to agents of the attorney, such as paralegals, investigators, and secretaries, as well as "outside experts" such as "accountants, interpreters or polygraph examiners." *Id.* at 491. Medline does not argue that Lyon was Burrus's agent, so in order for the privilege to apply, Lyon must fall into the latter category of "outside experts."

Although at first glance it appears that Lyon might belong in that category, key aspects of his function as a third-party fact witness exclude him from the umbrella of the attorney-client privilege. It is true that Lyon's declaration supported Medline's patent application, but he was not assisting Burrus in his rendering of legal services in the same way that accountants, interpreters, or polygraph examiners traditionally assist attorneys in providing legal services. For example, unlike the third party in *Jenkins,* there is no indication that Lyon advised Burrus regarding rules, procedures, or other information within his area of expertise, or facilitated Burrus's representation in the same way a paralegal or an administrative assistant would. *See id.* at 490. Nor has Medline presented any evidence that Lyon assisted Burrus by transmitting or interpreting Medline's communications, or formulating opinions for him based on Medline's

16

communications. *See id.* at 491. Rather, Lyon's declaration was supposed to have served as a *third-party* rebuttal to the USPTO examiner's obviousness rejection. (See R. 190, Pl.'s Opp. at 12.) And, as Bard points out, Medline previously described the declaration as an "objective indication[] of candor and good faith" on Burrus's part, implying that he had little influence over Lyon's declaration.[2] (See R. 141, Pl.'s Opp. to Def.'s Mot. for Leave to File Second Am. Answer at 9.) As such, Lyon is not an "outside expert" to whom privilege should apply. This reading of *Jenkins* is consistent with the general principle that because privilege "is in derogation of the search for the truth, it is construed narrowly." *See Evans*, 113 F.3d at 1461 (citations omitted). Furthermore, unlike in *Jenkins*, the question here is not whether Lyon's "presence" during communications destroys any privilege as between Medline and Burrus. *See* 487 F.3d at 490-91. For all these reasons, *Jenkins* is distinguishable from the facts in this case and the court finds that the attorney-client privilege does not extend to the draft Lyon declarations.

**D. Tomes Agreement**

As for the Tomes Agreement, however, this court agrees with Medline that the motion should be denied. Based on this court's *in camera* review of the agreement, the redacted portions either convey legal advice, and are therefore privileged, *see Stopka v. Am. Family Mut. Ins. Co.*, 816 F. Supp. 2d 516, 532-533 (N.D. Ill. 2011), or relate to the terms of Cooley's representation of Tomes, and are

---

[2] These varying characterizations of Lyon's role, while not dispositive, do lead this court to view with some skepticism Medline's current assertion that Lyon "worked closely" with Burrus. (See R. 190, Pl.'s Opp. at 3.)

17

therefore not relevant to any claim or defense in this case, *see In re Front Loading Washing Mach. Class Action Litig.*, No. 08-51, 2010 WL 3025141, at *4 (D.N.J. July 29, 2010) (denying request to compel production of retainer agreements because moving party failed to demonstrate how the information is relevant or necessary). Because no further disclosure of the Tomes Agreement is necessary, the court need not address Medline's argument that the agreement is protected by the work-product doctrine.

## Conclusion

For the foregoing reasons, Bard's motion to compel is granted in part and denied in part.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**