UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MEDLINE INDUSTRIES, L.P.,

       Plaintiff,

    v.

C.R. BARD, INC.,

       Defendant.

No. 14 CV 3618

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Medline Industries and C.R. Bard, Inc., both producers of medical supplies, have been disputing patent claims in this and related proceedings for many years. In 2022, after the court issued a summary-judgment decision, defendant Bard disclosed a survey that it had previously failed to turn over, despite having the document in its possession for four years. Medline now moves for sanctions. Its motion is granted.

## I.    Legal Standard

Federal Rule of Civil Procedure 26(e)(1) provides that a party who has made a disclosure under Rule 26(a) or "who has responded to an interrogatory, request for production, or request for admission…must supplement or correct its disclosure or response," if the disclosure or response was "incomplete or incorrect" and if the additional information hasn't otherwise been made known to the other party. The consequences for failing to comply come from Rule 37, which provides various forms of sanctions that the court can impose. Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi), (c)(1). Only a finding of negligence is required to impose sanctions under Rule 37, unless dismissal or default is being imposed, in which case a finding of willfulness is

required. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642–43 (7th Cir. 2011).

## II.    Background

### A.    Infringement Disputes

The parties in this case, Medline Industries, Inc. and C.R. Bard, Inc., design, manufacture, and distribute medical products, including catheter tray kits. [694] at 2.[1] In 2014, Medline sued Bard, alleging that the use of certain catheter kits produced by Bard, including the SureStep kit, directly and indirectly infringed claim 1 of Medline's method patent, U.S. Patent No. 8,448,786, entitled "Catheter Tray, Packaging System, Instruction Insert, and Associated Methods." [694] at 2. Claim 1 of the patent states:

> 1.    A method of using a catheter package assembly, comprising:
>
> opening a thermally sealed bag disposed about a tray having a catheter assembly disposed therein;
>
> accessing an instruction manual;
>
> unfolding one or more layers of wrap to reveal an additional layer of wrap and the catheter assembly; and
>
> placing one of the one or more layers of wrap or the additional layer of wrap beneath a patient, thereby transforming an area beneath the patient from a non-sterile field to a sterile field.

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are taken from Judge Lee's summary-judgment opinion, [694], which takes its facts from the parties' Local Rule 56.1 statements of fact and statements of additional fact. [526-1], [545-1].

At issue here is discovery related to the last clause of claim 1 (the placement of a layer of wrap beneath a patient), and whether I should impose sanctions against Bard for its failure to turn over a study concerning the frequency of underpad use.

In 2014, Medline brought claims of direct infringement, induced infringement, and contributory infringement. [37]; [694]. The parties filed and cross-filed for summary judgment on various issues. *See* [545]; [578]; [589]. Judge Lee granted summary judgment in favor of Medline on its direct- and induced-infringement claims. [694] at 12, 14. He denied summary judgment on Medline's contributory-infringement claim. [694] at 16.

As to direct infringement, Medline argued that the SureStep kit's directions instruct the user to complete every step that's listed in claim 1. Because of that, at least one clinician had performed all of the method steps of claim 1 when using Bard's SureStep catheter kit, it said. [694] at 5, 7. Bard's main counterargument (which Judge Lee found Bard to have waived) was that its allegedly infringing "Directions for Use," provided along with its SureStep kit, omitted the step concerning placing layers of wrap beneath a patient. [694] at 5–8. Judge Lee said that, even if Bard hadn't waived that argument, it had failed to raise a genuine issue of material fact for trial on direct infringement. [694] at 9. That's because Bard's "Directions for Use" instructed clinicians to "[p]lace underpad beneath patient, plastic/'shiny' side down." [694] at 9. Despite Bard's contention that a clinician following those instructions wouldn't necessarily directly infringe because the directions allow use of *any* underpad (not just the one provided), no reasonable juror would read the instruction

to refer to anything but the underpad provided in the SureStep kit, Judge Lee said. [694] at 9.

Judge Lee next found that Bard had induced infringement by instructing clinicians, via its directions for use, to perform every method step in claim 1. [694] at 14. It had also induced infringement through an instructional video on its website that provided a step-by-step demonstration of how to catheterize a patient using the SureStep kit. [694] at 14. Finally, Judge Lee denied summary judgment on Medline's contributory-infringement claim. [694] at 16. At issue in his analysis was whether the SureStep kit had a "substantial non-infringing use." [694] at 15 (citing *Grunenthal GMBH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333, 1340 (Fed. Cir. 2019)). Medline relied on Bard's directions for use and the instructional video as evidence that there were no substantial non-infringing uses, but the court said that wasn't enough. [694] at 16.

### B. Surveys

In its first set of requests for production, Medline asked for the following, [705-4] at 3, 5, 8 (RFPs #27, 39, 61):

> From 2008 to the present, all documents and things concerning customer usage surveys concerning the Accused Products.

> From 2008 to the present, any consumer surveys concerning the Accused Products.

> All documents and things concerning the product features that are most important to purchasers[] or customers of the Accused Products when making their purchase decisions, and any analyses, evaluations, surveys, and reviews concerning such features and decisions.

In response to each, Bard objected to "Medline's definition of 'Accused Products' as overly broad, unduly burdensome, vague, and ambiguous to the extent that it includes products not charted in Medline's August 22, 2014 Infringement Contentions." [705-4] at 4, 5, 9.

In response to discovery requests, Bard provided Medline a 2016 observational study on clinicians' compliance with the SureStep kit's directions for use. [707-3]. In that study, an observer documented which steps participants took when they used the catheter and in what order they completed the steps. [707-3] at 8. Clinicians were randomly assigned one of two Bard catheter tray models, the SureStep or the Advance. [707-3] at 8. Observers found that 50 percent (64) of clinicians using the SureStep performed all 17 steps laid out in the directions for use (although not necessarily in the correct order), 25 percent (16) omitted one step, 9 percent (6) omitted two steps, and 17 percent (11) omitted three or more steps. [707-3] at 13–14.

Of the 16 clinicians who omitted one step, 14 placed the underpad beneath the patient (in other words, the omitted step was not the underpad step). *See* [707-3] at 14 ($16 - 2 = 14$). Of the 6 clinicians who omitted 2 steps, 4 placed the underpad. *See* [707-3] at 14 ($6 - 2 = 4$). Of the 11 clinicians who omitted 3 or more steps, 7 placed the underpad. *See* [707-3] at 14 ($11 - 4 = 7$). In total, 89 of the 128 participants placed the underpad beneath the patient. ($64 + 14 + 4 + 7 = 89$.) That means roughly 70 percent of the observed clinicians used the underpad provided. ($89/128 = 69.5$.)

When arguing that its product had substantial non-infringing uses of Medline's method (and to undermine Medline's claim that all sales of the SureStep kit should

5

count toward damages), Bard marshaled evidence that clinicians did not use the underpad beneath the patient. *See* [545-35] ¶¶ 90–91, 94–96 (Dr. Hillstead stating in expert report that, based on his review of clinicians' depositions, his own experience, his discussion with Dr. Yun, and his review of the record, clinicians frequently don't use the underpad); [444-5] ¶¶ 27–28 (Dr. Yun stating in expert report that he commonly instructs nurses to use facility-provided underpads instead of underpad provided in the kit); [578-5] at 109:3–112:8 (Dr. Yun testifying that based on his education, years in practice, "placing four or five thousand of these catheters," and watching other clinicians place many catheters, it's much more common to use facility-provided underpads than the ones in the kit). And Bard criticized Medline for not marshaling more evidence of clinicians using the SureStep underpad as described in the patent claim. [578] at 20–27.

Unbeknownst to Medline, in 2018, Bard conducted another survey after it had released a redesign of the SureStep kit. That study surveyed respondents who used three models of Bard's catheter trays: SureStep, Advance, and Legacy. [707-2] at 10. Asked, "Which [] tray configuration does you[r] facility use?" two-thirds of respondents said SureStep, 20 percent said Advance, less than 2 percent said Legacy, and 10 percent said they didn't know. [707-2] at 10. The 2018 survey did not differentiate between the original and redesigned SureStep models—in fact, it didn't ask SureStep users which model they used.

On average, respondents used the underpad provided in the catheter kit roughly 77 percent of the time. [707-2] at 22. The average percentage, though, doesn't

account for the large distribution in responses. Fifty-three respondents answered the question about how often they place the provided pad underneath the patient. [707-2] at 22. Of those, 25 said they used the pad 100 percent of time. *See* [707-2] at 22–23. Including another five clinicians, 30 of the clinicians said they used the pad 95 percent or more of the time. *See* [707-2] at 22–23. The median use was 99 percent. *See* [707-2] at 22–23. Compared to the 2016 survey, those findings were more favorable to Medline's theory that the kit had no substantial non-infringing use.

The 2018 survey also asked respondents what percent of the time their peers used the underpad provided. [707-2] at 24. The 53 clinicians who responded said that, on average, their peers used the pad roughly 62 percent of the time. [707-2] at 24. The median use was 53 percent. *See* [707-2] at 24–25.

Throughout expert depositions, expert-report drafting, and summary-judgment briefing, Medline didn't know the 2018 survey existed, let alone have access to it. Bard says that its outside counsel learned of the survey in March 2022. [711-1] at 5, 6, 9, 12. Judge Lee's summary-judgment opinion was issued March 30, 2022. [694]. Bard produced the survey three months later in July, under the auspices of separate litigation between Medline and Bard. [711-1] at 12.

On July 25, 2022, Medline notified Bard of its intent to move for sanctions, [707-8] at 2, and filed its motion roughly two weeks later, [705]. Medline moves to impose the following sanctions: preclude Bard from disputing the extent of underpad use, instruct the jury to award damages for all SureStep sales, and inform the jury that Bard withheld evidence about the extent of its infringement. [705-1] at 16–18.

7

### III. Analysis

#### A. Bard Failed to Comply with its Discovery Obligations

Rule 26(e) requires a party to supplement or correct its response to a discovery request if the party learns that the disclosure or response is "incomplete or incorrect" in "some material respect." Bard argues that it complied with its Rule 26 discovery obligations because its responses to Medline's requests were neither incorrect nor incomplete. [710] at 11. It points to the wording of Medline's requests. Each request asked for documents related to the "accused products." [710] at 10. Bard says that when Medline submitted those requests in 2014, "accused products" couldn't have included the SureStep redesign because it wasn't released until 2016. [710] at 10. Even after 2016, "accused products" didn't include the redesigned version because Medline didn't amend its Infringement Contention Chart to include the redesign, Bard says. [710] at 10. In fact, Judge Lee barred Medline from presenting expert reports that mentioned the redesign. [481] at 5; [682] at 1 (denying Bard's motion to enjoin Medline's redesign-related suit) ("While this case was pending, Bard redesigned its trays and successfully argued that Medline should be barred from presenting expert reports regarding Bard's redesigned trays due to Medline's failure to amend its Final Infringement Contentions.").

Bard's narrow reading might make sense in reference to requests #27 and #39 ("all documents and things concerning customer usage surveys concerning the Accused Products," and "any consumer surveys concerning the Accused Products"). [705-4] at 3, 5. But it doesn't make sense in the context of request #61: "All documents and things concerning the product features that are most important to purchasers[]

or customers of the Accused Products when making their purchase decisions, and any analyses, evaluations, surveys, and reviews concerning such features and decisions." [705-4] at 8. There is no difference between the underpad in the original kit and the underpad in the redesigned kit. The only difference between the kits has to do with their layouts. Both kits feature compartments that separate the various components in the kit. [682] at 2. The original kit has an opening in the wall between the large compartment and small compartment. The redesigned kit does not have an opening in the wall. [682] at 2. So any surveys about (non-wall opening) product features that are important to consumers of the original product necessarily concern the same features in the redesigned product, and vice versa. The underpad is an important feature of the accused product, and a survey about its use in the redesigned product bears on its use in the earlier design. Bard's fixation on the meaning of "accused products" is unpersuasive.

Even if it were persuasive—that is, even if I construed the requests for production as only requesting information about features in the original SureStep kit—Bard would have had a duty to turn over the 2018 survey. Both parties seem to take for granted that the 2018 survey is specifically about the redesigned kits. *See* [705-1] at 13; [710] at 10–11, 15. But nothing in the survey itself suggests that it is. In fact, as noted above, more than one in five respondents used non-SureStep models (20 percent used Advance and less than 2 percent used Legacy), and 10 percent of respondents didn't know which model they'd used. [707-2] at 10. That suggests that the survey was about Bard's catheter trays generally, and not any specific model.

What's more, the survey didn't ask whether the SureStep users were using the original or redesigned kits. [707-2]. While the year of the survey (2018, two years after the 2016 rollout of the redesign) might make it likely that the majority of SureStep-user respondents were using the redesign, it's possible that at least some survey respondents were using the earlier model. Bard therefore had a duty to disclose the survey.

It's no excuse that discovery closed in 2016, two years before the survey was conducted. [212]. For one, discovery was reopened twice: from January 11, 2019 to May 31, 2019, for post-claim construction factual discovery, and from November 23, 2020 to January 14, 2021, for conducting depositions about Medline's manufacturing capacity. [354], [362], [367], [593], [594], [707-9] at 2–3. Two, even if it had remained closed, Bard had an ongoing obligation to correct the record. Rule 26(e)(1)(A) does not say that a party's obligation to supplement or correct ends at any time, let alone before the court has issued an order on a dispositive motion.

Bard quotes *Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc.* for the proposition that there is not a "general and on-going duty of supplementation throughout the entire life of an action, regardless of the procedural posture of the case or the relative significance of the discovery to a final resolution." [710] at 12 (quoting 2010 WL 2735694, at *1 (E.D. Wis. July 12, 2010)). The court in *Thompson* said the duty to supplement is only "triggered when a party later becomes aware of information or documents that undermine the accuracy or completeness of its original discovery responses," which was not the case there. *Thompson*, 2010 WL

10

2735694, at * 1. In fact, the documents sought weren't relevant or useful to the remaining issue. Nor was there any indication that the documents would have affected the court's earlier summary-judgment decision. This case is different. As explained below, the study's findings were relevant to the direct- and indirect-infringement analyses.

The other case Bard relies on, *Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.*, does support its argument. In that case, discovery was open for seven years. 2008 WL 4786671, at * 1 (N.D. Cal. Oct. 29, 2008). After discovery closed, defendants learned of documents created after the close of discovery that concerned electrical failures that occurred while discovery was still open. *Id.* Those documents weren't turned over, and defendants argued plaintiffs had an obligation to produce them. The court disagreed. It said the duty to supplement "is directed to documents generated during the relevant time frame previously not produced but subsequently discovered." *Id.* at *2. It continued: "To say that the duty to supplement covers documents generated after that date would render meaningless any delineated time period for production…[N]othing in [Rule 26(e)(1)] imposes a never-ending obligation to produce documents continuously as they are created." *Id.* But the Advisory Committee Notes strongly imply that the obligation to correct or supplement continues after the close of discovery. One note says that "[s]upplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period, and with special promptness *as the trial date approaches*." Fed. R. Civ. P. 26(e) advisory committee's note to 1993

amendment (emphasis added). Discovery often closes long before the beginning of trial and the duty to supplement is not boundless if it reaches relevant information, covered by a discovery request, learned by a party before trial.

What's more, distinguishing between documents generated before and after the close of discovery "could pose a serious risk of unfairness to the discovering party, since documents created or acquired after discovery but before trial might entirely undercut the gist of earlier discovery responses, thus placing the discovering party at a severe and entirely unfair disadvantage." *Pizza Pub. Co., Ltd. v. Tricon Glob. Rests., Inc.*, 2000 WL 1457010, at *1 (S.D.N.Y. Sep. 29, 2000). In some circumstances, it could even "create the opportunity for a producing party to seriously mislead its adversary, for example by deliberately delaying some of its informal fact investigations (including document acquisition) until after the close of discovery." *Id.* The fact that discovery closed (for the first time) before the survey was conducted did not change Bard's obligation to correct the record.

## B.   Bard's Failure to Comply was Neither Substantially Justified nor Harmless

Bard next claims that even if it had an obligation to disclose the survey, its failure to do so was substantially justified and harmless. I have broad discretion to decide whether a failure to disclose is substantially justified and harmless, and I am guided by four factors: "1) the prejudice or surprise to the party against whom the evidence is offered [a factor not relevant here because the survey is advantageous to Medline], 2) the ability of the party to cure the prejudice, 3) the likelihood of disruption to the trial, and 4) the bad faith or willfulness involved in not disclosing

12

the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).

Bard emphasizes the language of Rule 26(e)(1)(A). It says that a party must supplement or correct "*if the party learns*" that the disclosure was incomplete or incorrect (emphasis Bard's). [710] at 13. Bard's outside counsel allegedly only learned of the survey in 2022, so (Bard says) its duty to disclose wasn't triggered until then. [710] at 13–14. Not so. Bard itself knew about the survey in 2018 because Bard *conducted* the survey. It doesn't matter that counsel may not have known about the survey. "[T]he duty, while imposed on a 'party,' applies whether the corrective information is learned by the client or by the attorney." Fed. R. Civ. P. 26(e) advisory committee's note to 1993 amendment. Bard knew about the survey and knew it was responsive; that's enough to impose an obligation of disclosure, regardless of what its counsel did or didn't know.

Next, Bard argues that its failure to disclose was harmless because the 2018 survey was consistent with other evidence, including the testimony of experts and the 2016 study. [710] at 14–15; [711-1] at 14–15 (unredacted version). First, the experts based their testimony on the evidence that was disclosed. It's possible that the experts' testimony would have been different had they had access to the 2018 survey (which their testimony at least suggests they didn't). Second, while the 2016 and 2018 studies didn't have radically different findings, the 2018 findings did cut more in Medline's favor than the 2016 findings. The 2016 study found that clinicians used the

underpad on average 70 percent of the time. [707-3] at 14. For the 2018 study, that number was 77 percent. [707-2] at 22.

The 2018 study's findings would have been relevant to each infringement claim at summary judgment. To prevail on its direct-infringement claim, Medline had to show that at least one clinician using the SureStep kit carried out all the steps in claim 1. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014). One of the elements of both induced and contributory infringement is direct infringement, so showing that at least one clinician had carried out all the steps in claim 1 was also necessary to proving induced and contributory infringement.

The 2018 survey definitively showed that in non-observational settings, the majority of respondents placed the pad underneath the patient at least some of the time. That likely would have been enough to end the direct-infringement analysis, had the court had access to those findings. Instead, the court spent time deciding whether a reasonable jury could conclude that no clinician had ever used the underpad when following SureStep's directions for use. [694] at 9–12. That analysis included combing through expert testimony and other direct-infringement cases that Bard relied on. [694] at 9–12.

True, the court ultimately ruled in Medline's favor on direct and induced infringement. But a failure to comply with discovery obligations isn't automatically harmless just because the other party prevailed. (And understandably so. If it were otherwise, parties who had prevailed on the merits would never be entitled to attorneys' fees for work that could have been avoided if they'd had access to previously

undisclosed documents.) What's more, without access to the survey, Medline didn't have the opportunity to cross-examine Bard's experts about the survey's findings. Nor could they ask their own experts about it.

To top it all off, Bard consistently accused Medline of not having sufficient evidence to back up its claim that clinicians used the underpads provided—while possessing that very evidence. It said Medline had presented only hypothetical, rather than actual, instances of infringement. [578] at 20; [694] at 10. It took plaintiff's experts to task for "speculative" testimony that, Bard said, failed to show specific instances of infringement. [578] at 25–26. It noted that neither Barbara Weintraub nor John Abraham (Medline experts) had used or remembered using a SureStep kit. [578] at 25. Their comments about whether a clinician would be *likely* to use the provided underpad didn't suffice for showing a specific instance of infringement, Bard said. [578] at 25–26. Finally, Bard said, "Medline could have presented testimony from clinicians with relevant experience or *taken surveys of clinicians*, but it didn't." [578] at 27 (emphasis added). Bard didn't mention that Bard itself had conducted such surveys, and that the results showed clinicians using the underpad as described in the claim—the specific instances of infringement that Bard argued Medline couldn't show.

In contrast to its direct- and induced-infringement claims, Medline didn't prevail on its contributory-infringement claim. [694] at 16. To prove contributory infringement, Medline had to show that 1) Bard knew of the '786 patent, 2) knew there was patent infringement, and 3) the accused product Bard was selling wasn't a

15

staple article or commodity of commerce suitable for substantial non-infringing use. *See* [694] at 15 (citing *Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021), and 35 U.S.C. § 271(c)). Judge Lee found that Medline fell short on the last element because it hadn't met its burden of establishing that there was not a substantial non-infringing use. [694] at 15–16.

To argue that there was no substantial non-infringing use, Medline relied only on the SureStep kit's directions for use and Bard's online instructional video. [694] at 15–16. "In essence," the court said, "all Medline has done is argue that following the SureStep kit's directions-for-use is the most logical purpose for the product." [694] at 16. But just because "practicing the patented method may be the most logical or useful purpose" for the product doesn't mean that alternative uses are "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental"—the standard for showing no substantial non-infringing use. *Id.* at 16 (quoting *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012)).

Had Medline had access to the survey, it could have at least gotten closer to meeting that standard. That isn't to say that Medline would have prevailed on its contributory-infringement claim; a 23 percent average non-infringing-use rate is not a slam dunk. But Medline's strategy would no doubt have changed. It might have, for instance, focused on the fact that the study's median rate of use was 99 percent. Or that 30 of the 53 respondents said they used the underpad 95 percent or more of the time, while only 16 said they used it less than 50 percent of the time. By the time

16

Bard disclosed the survey—four months after Judge Lee's opinion—it was too little, too late for summary-judgment purposes; Bard had no ability to cure the prejudice. *See Tribble*, 670 F.3d at 760 (ability to cure prejudice a factor in harmlessness analysis). Because Bard denied Medline the opportunity to make those sorts of arguments, its failure to disclose was not harmless.

Beyond affecting summary-judgment proceedings, Bard's conduct harmed trial preparation. Trial was originally set to start on February 3, 2020. [353]. That trial date was set by Judge Lee on February 19, 2019. [353]. For a full year, Bard knew that trial was approaching but failed to turn over responsive documents, leading Medline to expect that the evidence (based on the discovery conducted) would remain the same at trial and to base its trial strategy on that record. Bard is arguably lucky that trial was pushed back, and Medline has had time to consider the 2018 survey.[2] But it is now too late (and not a good use of time) to reopen discovery to give Medline a chance to question Bard's experts about the 2018 survey. So if Medline chooses to use the 2018 survey at trial, it does not know the answers to some questions it may pose. Civil trials are not supposed to be that surprising. Bard's conduct has interjected uncertainty into the factual presentation, and that is prejudicial to Medline.

---

[2] Had Medline learned of the 2018 survey after the case went to trial, Bard would be looking at more severe sanctions.

### C. Appropriate Sanctions

Medline asks that I preclude Bard from disputing the extent of underpad use at trial, instruct the jury to award damages for all SureStep sales, and inform the jury that Bard withheld evidence of the extent of its infringement. [705-1] at 16–18. Medline also asks that I reserve the possibility of directing entry of default judgment, [705-1] at 19, a sanction that can only be imposed after a showing of willfulness, bad faith, or fault. *e360 Insight, Inc.*, 658 F.3d at 642–43.

Sanctions must be proportionate to the circumstances. *Donelson v. Hardy*, 931 F.3d 565, 569 (7th Cir. 2019); *Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 499 (7th Cir. 2008). "Considerations relevant to proportionality include the extent of the misconduct, the ineffectiveness of lesser sanctions, the harm from the misconduct, and the weakness of the case." *Ebmeyer v. Brock*, 11 F.4th 537, 547 (7th Cir. 2021) (citation omitted).

Two of Medline's requested sanctions—precluding Bard from disputing the extent of underpad use and instructing the jury to award damages for all SureStep sales—rest on the same arguments. First, Medline notes that Judge Lee prevented Bard from contesting the extent of underpad use as a defense to any of Medline's infringement claims. [705-1] at 16 (citing [694] at 8). Judge Lee reached this conclusion because, until expert discovery, Bard's sole non-infringement contention was that Bard had not used the SureStep product with any patient. [694] at 6–7. Only during expert discovery did Bard reveal a different non-infringement contention: that kit users don't use the provided underpad. Bard's last-minute change prejudiced Medline by depriving it of "the opportunity to pursue fact discovery to disprove a

18

theory that Bard ha[d] never disclosed." [694] at 8. Judge Lee's decision only blocked Bard from asserting the underpad defense at the liability stage, not the damages stage. Medline seems to acknowledge this difference. It says, "Bard should not be permitted to confuse the jury by offering a prohibited non-infringement theory under the guise of disputing damages or contesting willfulness." [705-1] at 17. Limiting instructions address this concern, and here, the jury will be instructed that infringement has been established. There is little risk the jury will use the evidence for an improper purpose.

What's more, precluding Bard from disputing the extent of underpad use (which would have the same effect as instructing the jury to award damages for all SureStep sales) is a particularly severe sanction. Bard's conduct certainly caused harm, but the harm wasn't so severe (e.g., withholding a study that showed, say, an above 95 percent average usage rate) that the jury should be kept from making its own decisions based on the evidence. Nor is Bard's damages theory weak. *See Ebmeyer*, 11 F.4th at 547 (weakness of case a factor in fashioning appropriate sanctions). A calculation of lost profits or royalties may be affected by a consideration that, according to the 2018 study, Bard's product was not used with Medline's patented method 23 percent of the time. Bard is not precluded from making arguments about the extent of underpad use, and I will not instruct the jury to award Medline damages for all SureStep sales.

I will, however, inform the jury that Bard withheld evidence it was obligated to disclose. That information is relevant for three reasons. First, it's relevant to

whether Bard's infringement was willful. *See Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1177 (Fed. Cir. 2022) (infringer's "behavior as a party to the litigation" and whether infringer attempted to conceal its misconduct are factors in determining willfulness). Second, it will allow the jury to draw inferences about the study's weight that the jury wouldn't be able to otherwise. At trial, Bard may say that the study's findings don't support Medline's case—either because a 77 percent average usage rate isn't so different from the 70 percent average usage rate from the 2016 study, or because the 2018 study had low statistical validity. If the jury knows that Bard didn't disclose the study, the jury may be suspicious of these arguments. Bard will not be allowed to offer alternative explanations for its failure to disclose the 2018 survey. The jury will be allowed to infer that Bard didn't disclose the study *because* it would have been helpful to Medline. Third, informing the jury will serve as a general deterrent to other litigants who might consider this sort of behavior. *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (one purpose of sanctions is general deterrence); *Greviskes v. Univs. Rsch. Ass'n, Inc.*, 417 F.3d 752, 757, 759 (7th Cir. 2005).

Medline also asks that I order Bard to show cause for its failure to produce the study and reserve the possibility of directing entry of default judgment against Bard. [705-1] at 19. This sanction is only appropriate if, after Bard is given the opportunity to show cause, I find that Bard acted willfully and in bad faith. *e360 Insight*, 658 F.3d at 642. Medline may have a good argument that Bard was acting in bad faith. That wouldn't be inconsistent with past behavior, at least. Just two years ago, Bard was

sanctioned in a related case for failure to disclose certain information in discovery. *See Medline Indus., Inc. v. C.R. Bard, Inc.*, 2021 WL 809734 (N.D. Ill. Mar. 3, 2021) ("*Medline III*") (sanctioning Bard for producing sample of further redesign kit after the close of discovery). Though Bard's conduct was unacceptable, it seems unlikely that its conduct was so egregious as to warrant an entry of default judgment—a penalty that should be reserved for the worst offenders. And at this stage, nearly a decade into the litigation, show-cause briefing is not a good use of the parties' or the court's time.

Finally, Medline's lawyers spent time and effort briefing this motion for sanctions—time and effort that wouldn't have been expended had Bard complied with its discovery obligations in the first place. Bard must pay Medline the reasonable attorneys' fees Medline incurred in briefing this motion.

## IV. Conclusion

Medline's motion for sanctions, [705], is granted. At trial, the jury will be informed that Bard violated its discovery obligations by failing to produce the 2018 survey. Bard is also ordered to pay the reasonable attorneys' fees Medline spent briefing the motion for sanctions. Bard's motion to seal its response in opposition to plaintiff's motion for sanctions, [711], is granted.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  March 30, 2023